STEVEN G. KALAR
Federal Public Defender
CYNTHIA C. LIE
Assistant Federal Public Defender
55 South Market Street, Suite 820
San Jose, CA 95113
Telephone: (408) 291-7753

Counsel for Defendant McMAHON

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| UNITED STATES OF AMERICA, | ) | No. CR-13-00345 EJD |
|---|---|---|
| Plaintiff, | ) ) ) | DEFENDANT'S SENTENCING MEMORANDUM |
| vs. | ) ) | |
| LISA McMAHON, | ) ) | Date: August 25, 2014<br>Time: 1:30 p.m. |
| Defendant. | ) ) | Court: 4 |

## INTRODUCTION

Defendant Lisa McMahon submits the following sentencing memorandum in support of her request for a sentence of no more than one year and one day in custody, in view of her childhood history's impact on her susceptibility to the offense conduct under the circumstances in which she committed it, her mental health history, the aberration the offense conduct represents in an otherwise law-abiding life, and the minimal risk of recidivism she presents. A sentence within the advisory guideline range would violate the overarching mandate of the Sentencing Reform Act that the sentence be "sufficient, but not greater than necessary" to achieve the Act's stated purposes. 18 U.S.C. § 3553(a).

/ / /

/ / /

## FACTUAL BACKGROUND

At the age of nine, Lisa McMahon was cast off by her biological father, losing his financial support and also her home, modest possessions, even her clothing and her kitten. PSR ¶ 34. A casualty of her parents' acrimonious divorce and her father's preference for his male offspring, Ms. McMahon spent the next few years as a transient, her one-time homemaker mother able to find only part-time employment. The pair was compelled to move several times, sometimes together and sometimes separated as Ms. McMahon was deposited with other relatives. *Id.*

When her mother eventually remarried and settled in Salinas, California, Ms. McMahon found that the ensuing financial stability came at the cost of near-constant anxiety in the home of her new stepfather, "an angry man" who "seemed to hate human beings equally." Letter of Thomas Foxx, attached as Exh. 4. The stepfather "ran the household like a prison. It was just his overall way, harsh and emotionally abusive." *Id*. The manner of her parents' divorce having taught her to value stability and above all her relationship with her mother, Ms. McMahon learned to cope with the abusive environment and did her utmost to placate her stepfather in the interests of maintaining the family unit. Even as an adult, no longer in his custody, she fortified herself for visits to her mother and stepfather by taking anti-anxiety medication in advance, to mitigate the inevitable tension-induced abdominal pains. PSR ¶ 36.

Compounding the emotional strain of domestic relations with her stepfather was the suicide of her maternal grandfather and the attempted suicide of her maternal half-sister after the half-sister was nearly killed by an ex-husband. PSR ¶ 37. When, as a young adult, Ms. McMahon ventured away from her stepfather's household and attempted to begin life as an independent single woman and college student, she then fell victim to violent crime. PSR ¶ 36. She met her future husband the following year, and within three years, she and Mark McMahon were married. PSR ¶ 38.

/ / /

Ms. McMahon worked full-time in payroll accounting from 1981, through the birth of her two children, until 2012. PSR ¶¶ 55. Throughout that time, she was the principal source of income for the family, as well as what its members describe variously as "the rock" of the family, its foundation and "the best mother." *See* Letters of Mark McMahon, Danielle McMahon and Cory McMahon, attached as Exhs. 1, 2 and 3, respectively. Her devotion to her husband extended as well to his family, whether it was tending to his bed-ridden and incontinent father, assuming the mortgage to buy the father's home and subsidize his nursing care, or worrying whether her sister-in-law approved of improvements she made to the home. *See* Exh. 1; *see also* Letter of Jean Elsa, attached as Exh. 7. Ms. McMahon explains that she "wanted to show [Mark McMahon] that with [her] he could have a good life filled with love and support." Letter of Lisa McMahon, attached as Exh. 9. She also continued her relationship with her mother and stepfather, whose volatile disapproval began to subside after she married and had her first child. PSR ¶ 36.

In 1996, Ms. McMahon began working for the Monterey Bay Aquarium Research Institute ("MBARI"). PSR ¶ 52. She obtained that employment as her husband's transmission repair business was failing, following a 1995 flood which destroyed not only his inventory of parts but his equipment and tools with the agricultural region's corrosive, pesticide- and fertilizer-infused floodwaters. PSR ¶ 46. She was a conscientious and valued employee, often communicating with her colleagues and/or supervisor as needed during off-hours or vacations. Exh. 1; *see also* PSR ¶ 9. Her responsibilities at MBARI, and its associated stresses, grew significantly over time, to the point that the McMahons began to resent the job's intrusion into their daily life. Exhs. 1 and 7. The family, however, was reliant upon her income. Exhs. 1 and 5. Her son, having been bullied in the local public high school, was thereafter enrolled in a private school where he was able to thrive. Exhs. 5 and 8. Her daughter, needing a specific program to obtain her business degree, left home to attend college at Sonoma State University. Exh. 8. Ms. McMahon obtained a second mortgage on the family home to cover the costs of

these developments, believing them to be essential. Exh. 5. These were advantages notably missing from her own upbringing. As her friends recount, "[t]hrough it all, [she] always tried her best to try to care for everyone and 'fix' everything. She was never able to say no, because she couldn't stand letting people down." Exh. 8. She was "someone you can always count on." Exh. 5.

In 2003, Ms. McMahon's stepfather was diagnosed with the debilitating heart disease that would end his life in 2004. Exh. 4; PSR ¶ 33. His illness and incapacitation substantially burdened Ms. McMahon's mother, who had medical issues of her own; this in turn prompted Ms. McMahon to come frequently to their aid, even while juggling her own family and professional responsibilities. Exhs. 1 and 4. "[Ms. McMahon's] determination to take care of family had her constantly traveling to see them, both when they lived in Hanford and after they moved to Arkansas." Exh. 1. Despite being afraid of air travel, for example, Ms. McMahon at one point flew to Arkansas to drive the pair to San Francisco for a medical procedure. *Id*. It was while dealing with her stepfather's illness and its collateral effects that Ms. McMahon began to siphon money from the MBARI accounts she had managed every day for the previous seven years. PSR ¶ 7.

After the death of her stepfather, the McMahon family made the decision – instigated by Ms. McMahon – to relocate to Arkansas to live near her mother. PSR ¶ 34; Exhs. 1 and 4. By that time in mid-2006, Ms. McMahon had taken approximately $60,000 in combined payroll and retirement account transactions. It was her intention to end her employment with MBARI, and she gave her supervisor six months' notice. Exh. 1. At the same time, she promised her supervisor that she "would never leave her stranded." Exh. 9. When potential replacements did not stay on, Ms. McMahon agreed to remain an employee, albeit as a telecommuter. Although MBARI had permitted staff in other areas to telecommute, the arrangement was evidently unprecedented for accounting staff. PSR ¶ 9.

As Ms. McMahon's employment at MBARI continued, so did the pressures of not only

her work but her personal life.  A close friend was diagnosed with a highly aggressive form of breast cancer, and when medical treatments became prohibitively expensive, the McMahons made their Salinas home available to the friend and her family at a reduced rent that could not cover their mortgage payment.  *See* Letter of Rhonda Fuller, attached as Exh. 6.  Her daughter, on graduating from college, invested all of her savings in a bakery/café that Ms. McMahon had opened in Arkansas with the intention of leaving MBARI.  *See* Exhs. 2 and 7.  Managing the necessary staff was not among Ms. McMahon's strengths, and the pressures of trying to manage both the business and the job "seemed to lead to a mental and physical breakdown."  *See* Exh. 7.  Her embezzlement from MBARI continued until January 5, 2012.[1]

## ARGUMENT

The Probation Office calculates the advisory guideline range as 33 to 41 months under the 2013 edition of the USSG § 2B1.1.  This range, produced by a guideline designed to maximize sentences indiscriminately, overstates Ms. McMahon's culpability for the offense, particularly in view of the relatively limited true pecuniary harm to MBARI or its insurer.  Ms. McMahon's history and background, combined with the circumstances leading to her commission of the offense, indicate a minimal risk of recidivism and a correspondingly reduced need for deterrence.  Accordingly, a sentence of no more than one year of confinement would be more than sufficient to meet the purposes of 18 U.S.C. § 3553.

**I.    The Advisory Range Under USSG § 2B1.1 Merits No Deference Because It Lacks Any Empirical Basis**

When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national

---

[1] Although the PSR reflects an ending date of March 22, 2012, the payroll transactions after January 5, 2012, appear to have been authorized payroll transactions – commensurate with Ms. McMahon's actual wages – managed by another MBARI employee.  There were 161 unauthorized payroll transactions from August 11, 2005, through January 5, 2012, and 13 unauthorized principal and interest loan transactions on four occasions from March 12, 2003, through May 26, 2011.

Defendant's Sentencing Memo
CR 13-00345 EJD                           5

experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007); *see also Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007). Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 555 U.S. 261, 264 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

When the Commission adopted the original guidelines in 1987, it elected to require some form of confinement for all but the least serious white collar cases, and adopted a fraud guideline ranging from 0-6 months to no more than 30-37 months for defendants in Criminal History Category I, at loss amounts exceeding $5 million. *See* USSG § 2F1.1 (1987). The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, Ch. 1, Intro., Pt. 4(d) (1987); *see also* U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 56 (2004) ["*Fifteen Year Report*"][2] (Commission sought to ensure that white collar offenders faced "short but definite period[s] of confinement"). However, the Commission quickly abandoned its original goal of ensuring "short but definite" prison sentences. Beginning just two years after the Guidelines went into effect, the Commission adjusted the offense levels such that prison sentences for fraud offenders were steadily increased. The practical effect of those increases is that Ms. McMahon's

---

[2] http://www.ussc.gov/research-and-publications/research-projects-and-surveys/miscellaneous/fifteen-years-guidelines-sentencing

current advisory range of 33-41 months represents more than a doubling of the 12-18 months that would have been contemplated under the 1987 Guidelines. This sentence escalation was divorced from any empirical rationale. Moreover, even accepting § 2B1.1's premise that loss is a proxy for offense seriousness, inflation has worked to further increase penalties: according to the United States Department of Labor's Bureau of Labor Statistics, the loss used to adjust the advisory range in the instant case would have amounted to the equivalent of $380,000 in 1987 dollars,[3] which would have further reduced the range to 10-16 months, within Zone C's authorization of a split sentence.

In 1989, the Commission amended the loss table to add, inter alia, two levels for a loss amount between $500,000 and $800,000. *See* USSG, App. C, Amend. 154 (Nov. 1, 1989). According to former Commissioner Michael K. Block (who had resigned in protest[4]) and former Deputy Chief Counsel Jeffrey S. Parker, the Justice Department's ex-officio member of the Commission had persuaded four of six Commissioners "that recent congressional enactments had given oblique 'signals' to the Commission to increase fraud penalties," when the statutes "said no such thing." Jeffery S. Parker & Michael K. Block, *The Sentencing Commission, P.M. (Post-Mistretta): Sunshine or Sunset*?, 27 Am. Crim. L. Rev. 289, 319 (1989). The Commission "gratuitously" increased punishment for larger fraud cases for reasons that were "overtly political and inexpert," and abandoned its statutory mandates by failing to rely on its own data, failing to measure the effectiveness or efficiency of guideline sentences, and failing to provide analysis of prison impact. *Id*. at 318-20.

In 2001, the Commission again adjusted the loss tables to provide, inter alia, an

---

[3] *See* http://www.bls.gov/data/inflation_calculator.htm.

[4] Paula Yost, Sentencing Panel Member Resigns over Research, Wash. Post, Aug. 23, 1989, at A25 (reporting that Commissioner Block resigned on August 22, 1989 "over what he said is a lack of commitment by commissioners to base decisions on research and scientific data when amending sentencing guidelines").

additional two levels for losses between $400,000 to $1 million, as part of the Commission's Economic Crimes Package. *See* USSG, App. C, Amend. 617 (Nov. 1, 2001). In so doing, the Commission stated that it was responding to "comments received from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and others, that [the fraud guideline] under-punish[es] individuals involved in moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under other guidelines." *Id*. While the Commission did not identify the "other guidelines" to which it referred, it becomes apparent from the proceedings upon which the amendment was based that it was referring to the drug guidelines. At the Commission's Economic Crimes Symposium in 2000, at which the issues and questions motivating the Economic Crimes Package were discussed by judges, stakeholders, and academics over a two-day period, the following question was formally posed and distributed in writing: "[I]f there is a current problem with the guidelines that is in need of repair, is it that fraud and theft are punished too leniently or that drug crimes are punished too harshly?" U.S. Sent'g Comm'n, *Symposium on Federal Sentencing Policy for Economic Crimes and New Technology Offenses* 54 (2000) ["*Economic Crimes Symposium*"].[5] The moderator of the corresponding plenary session posed the question whether economic crimes should be "punished in the same way that we punish drug offenders." *Id*. at 55. Although the participants in the Symposium roundly rejected the comparison of drug and fraud offenses as a false equivalence, *see id.* at 56, 58, 59, 65-66, 69, the Commission's institutional response to its own query was to increase the guideline range for fraud offenses, approaching the target guidelines for drug offenses, which remained materially unchanged. This effort to recalibrate fraud guideline to approximate the sentences available under drug guidelines demonstrates the irrationality of the Commission's enterprise: the guidelines for drug offenses are themselves untethered from empirical data or national experience, *see Gall*, 552 U.S. at 46 n.2; *Kimbrough*, 552 U.S. at 96,

---

[5]http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposium/ePlenaryIII.pdf

but were instead designed to be "proportional" to statutory mandatory minimums, *see* USSG § 2D1.1 comment. (backg'd) (1987), lack any empirical basis, and dramatically increased sentences for drug offenses "far above what had been typical in past practice, and in many cases above the level required by the literal terms of the mandatory minimum statutes." Fifteen Year Report at 49.

In 2003, the base offense level was increased from six to seven for defendants convicted of an offense with a statutory maximum of 20 years. See USSG App. C, Amend. 653 (Nov. 1, 2003). The Sarbanes-Oxley Act had raised statutory maximums for most fraud offenses after a "bidding war" in Congress. *See* Frank O. Bowman III, *Pour Encourager Les Autres?*, 1 Ohio State J. Crim. L. 373, 404 (2004). Thus, the one-level increase resulted in a 10% increase for most fraud offenders, including Ms. McMahon. As its stated reason, the Commission pointed to Congress's directive in section 905(b)(2) of the Sarbanes-Oxley Act, Pub. L. No. 107-204, which instructed it to consider whether the guidelines are "sufficient to deter and punish" certain economic crimes "in view of the statutory increases in penalties contained in the Act." *See* USSG App. C, Amend. 653 (Nov. 1, 2003) (Reason for Amendment). Having just substantially raised penalties in 2001, the Commission could have narrowly targeted the high-end corporate scandals that prompted the Sarbanes-Oxley Act, just as all commentators (other than the Department of Justice) had advised: the empirical evidence showed that across-the board-increases were unnecessary. However, nine months after the Sarbanes-Oxley Act was enacted, one Senator unilaterally inserted into the congressional record a "legislative history" stating that Congress meant the Commission to raise sentences for *both* high and low-level fraud offenders, with special attention to the asserted "penalty gap" between fraud and narcotics cases. *See* Bowman, *supra*, at 411-32. Consequently, the Commission raised the base offense level from six to seven, stating that the amendment "responds to increased statutory penalties" and that the higher base offense level is "intended to calibrate better the base guideline penalty to the seriousness of the wide variety of offenses referenced to that guideline, as reflected by statutory

maximum penalties established by Congress." *See* USSG App. C, Amend. 653 (Nov. 1, 2003). In doing so, the Commission, having already increased the loss tables to more closely match the unsound drug guidelines and by extension the statutory drug minimums, now explicitly tied the base offense level to the statutory maximum, once again abdicating its independent judgment as to how best to gauge the seriousness of the offense. *See* Bowman, *supra*, at 434.

**II.     "Loss" within the Meaning of § 2B1.1 is a Poor Proxy for the Seriousness of the Offense**

Irrespective of how loss is scored under § 2B1.1 in its various iterations, loss is the principal driver of the advisory range, despite being a highly imperfect measure of the seriousness of the offense. *See United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. Oct. 24, 2012) ("By making a Guidelines sentence turn on this single factor [loss or gain], the Sentencing Commission ignored [§ 3553(a)] and . . . effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"). The amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004). Defendants rarely set out to defraud others of a specific amount of money; rather, the amount of loss is dependent on the security procedures in place and the point in time when the fraud happens to be detected. *Id*. "Had [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more." *Id*.

The rationality of the reliance on loss amount is particularly dubious where, as here, the victim was insured for the full amount of the loss, and where the entity to which restitution shall now be paid is a for-profit insurer for which the risk of such loss is its reason for being and the assumed cost of doing business. The pecuniary harm to MBARI is limited to its $5,000

Defendant's Sentencing Memo
CR 13-00345 EJD                       10

deductible, whereas the pecuniary harm to the insurer is, given its business model, speculative at best.[6] In contrast, a fraud offense which caused an actual loss of $5,000 to a private individual of modest means would result in no adjustment under the § 2B1.1(b)(1)(A). Ms. McMahon accepts responsibility for the non-pecuniary harms that MBARI describes in its victim impact statement, and acknowledges that the scope of her offense is a relevant and aggravating factor, irrespective of the safeguards in place to insulate MBARI. However, the extent of the adjustment under § 2B1.1 is excessive, given the limited pecuniary impact on the entities involved.

### III. Ms. McMahon's Childhood History Made Her Particularly Susceptible to Financial Pressures and Stress

Although the gain to Ms. McMahon over time was significant, it is notable that the offense conduct appears to have been motivated not by unmitigated greed but rather by her subjective perception of her personal obligations, both emotional and financial, and the pressures produced by that perception. Ms. McMahon's turbulent and deprived childhood led her to internalize an uncomplaining housewifely ideal, not only functioning as the primary caregiver for her two children but also caring for her bedridden father-in-law, and eventually her mother and stepfather. *See* Letter of Mark McMahon, attached as Exh. 1; *see also* Letter of Jean Elsa, attached as Exh. 7. "She has always been the foundation of [the McMahon] family, even when it was a struggle for her to do so." Letter of Danielle McMahon, attached as Exh. 2. At the same time, Ms. McMahon was consistently "the primary source of financial support for [her] family." *See* Letter of Janice Smith, attached as Exh. 5. As Ms. McMahon endeavors to explain, her childhood experience cause her to "promise[] [herself] at an early age that [she] would make sure [her] family always felt secure, never having to worry about not having a place to call home." Exh. 9. Her commitment enabled the family to maintain Mr. McMahon's childhood home for a

---

[6]The Chubb Corp., *Annual Review* 2013 ("Net income grew 52% to $2.3 billion, and net income per share increased 59% to a record $9.04."), available at http://www.chubb.com/investors/chubb18117.pdf

Defendant's Sentencing Memo
CR 13-00345 EJD                                          11

time, despite his business hardships. *Id.*; *see also* PSR ¶ 56; Exh. 7. "Through it all, Lisa has always tried her best to tray to care for everyone and 'fix' everything. She was never able to say no, because she couldn't stand letting people down." Letter of Vincent Silva, Exh. 8. When the same stepfather who had been emotionally abusive of her throughout her childhood and adulthood fell ill, Ms. McMahon made every effort to ease the burden on her mother. "When her mother was living in Hanford, and even after she moved to Arkansas, it was nothing for [Ms. McMahon] to pick up and go to her on a moment's notice." Letter of Janice Smith, Exh 5. "It was completely in keeping with [her] nature to feel like she needed to drop everything to help [her] mom." Letter of Thomas Foxx, Exh 4. Taken to an extreme, "[s]he's not a strong-willed person, so the fact that she doesn't ever say no puts her in situations where she lets herself be taken advantage of." Letter of Rhonda Fuller, attached as Exh. 6. Ms. McMahon's offense conduct did not subsidize a lavish lifestyle but rather what she subjectively perceived to be the needs of those around her.

Ms. McMahon's hypervigilance regarding provision for her family was also exacerbated by her long history of emotional fragility, depression and anxiety, the symptoms of which emerged not long after she escaped her stepfather's home only to fall victim to violent crime. *See* PSR ¶¶ 36, 46. Those symptoms, magnified during her stepfather's illness prior to her initiation of the offense, intensified still further through 2009 as the competing demands on her limited physical and emotional reserves increased, causing substantial alarm within her family. *See* Letter of Cory McMahon, Exh. 3; Letter of Jean Elsa, Exh. 7. While her emotional condition cannot excuse her commencement or continuation of the offense conduct, it is nonetheless a mitigating factor that distinguishes her behavior from one who embarks on a fraudulent scheme with a less troubled mindset.

**IV. No More than 12 Months is Necessary to Promote Specific or General Deterrence**

The public opprobrium and notoriety to which Ms. McMahon's conduct has exposed her is a significant deterrent to the public that promotes respect for the law. Following an FBI press

release, her indictment was publicized in the local print and radio news in Mountain Home and Salinas alike. At her initial appearance, a reporter photographed Ms. McMahon as she waited with her family next to Courtroom 5, and a television camera crew stationed itself at the courthouse entrance to capture her departure. The publicity was particularly painful for Ms. McMahon, given her history of community involvement, from her teenage days as a candy striper to her recent work as a volunteer firefighter. PSR ¶ 35; Exh. 1. A sentence of any term of imprisonment for Ms. McMahon as a defendant with no criminal history will operate as an effective general deterrent.

Although received wisdom would have it that increasing the severity of sentences deters crime, the empirical evidence contradicts this mechanistic view. Increases in sentence length are ineffectual in increasing general deterrence: "Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006). While significant correlations have been discerned between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects." Andrew von Hirsch, et al, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (examining penalties in the United States and several European countries, pursuant to a commission by the British Home Office); *see also* Gary Kleck, et al, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005) (unlike the correlation between the certainty of punishment and crime rates, "[t]here is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms."); Anthony Doob & Cheryl Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis,* 30 Crime & Justice 143 (2003) (research indicates that deterrent

effects of harsher sentences fails to enhance public safety).

These conclusions apply not only to general deterrence of the community of potential offenders but also to specific deterrence of the individual defendant. For example, in a study of specific deterrence involving federal white collar defendants in the pre-guideline era, the data indicated that differences in sentencing – even between probation and imprisonment – produced no significant differences in specific deterrence. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). Research regarding white collar offenders in particular found no difference in the deterrent effect of probation and that of imprisonment. Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

Ms. McMahon's friends and family make clear that she feels acutely the gravity of her offense and this prosecution. "The effect her decisions have had on other people, not just [the McMahon] family but MBARI and the many people she cared deeply about there have caused her anxiety, panic attacks and a complete loss of desire to to perform even daily tasks." Letter of Danielle McMahon, Exh. 2. "Over the events of the past year and three months, it is clear to see how much sorrow and remorse [Ms. McMahon] has. [She] has punished herself in a way that most people cannot understand." Letter of Cory McMahon, Exh. 3. "For her the hardest part of reading the probation report wasn't the sentencing options or recommendation but the victim impact statement from MBARI about how actual people were affected." Letter of Mark McMahon, Exh. 1. "[S]he has been paying an emotional price for what she has done." Letter of Thomas Foxx, Exh. 4. Her friends note that the disconnect between the moral standards she had

instilled in her children make her sense of guilt for her offense more overwhelming. *See*, *e.g.*, Letter of Janice Smith, Exh. 5 ("She has strived hard to instill a sense of right from wrong in her children . . . [T]his is what makes it so hard for her to cope with the guilt she feels now."); Letter of Vincent Silva, Exh. 8 ("She has raised her children by instilling sound values in them. . . . Coming to terms with what happened has been a huge struggle for Lisa and her family. Lisa has definitely not taken this lightly."). Given her personal history and circumstances, the experience and stigma of a prison sentence of any duration is more than sufficient to punish and deter her.

## CONCLUSION

For the foregoing reasons, the defense respectfully requests that the Court impose a sentence no greater than one year and one day of confinement.

Dated: August 18, 2014

                                                                  Respectfully submitted,

                                                                   STEVEN G. KALAR
                                                                   Federal Public Defender

                                                                  s/
                                                                  CYNTHIA C. LIE
                                                                  Assistant Federal Public Defender